IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

KAANAPALI GOLF MANAGEMENT, )    CIVIL NO. 05-00672 SOM/KSC
INC., )
   )
       Petitioner and )    ORDER CONFIRMING ARBITRATION
       Counter-Respondent, )    AWARD
     vs. )
   )
INTERNATIONAL LONGSHORE AND )
WAREHOUSE UNION, LOCAL 142, )
   )
       Respondent and )
       Counter-Petitioner. )
_____ )

ORDER CONFIRMING ARBITRATION AWARD

I.       INTRODUCTION

       Petitioner Kaanapali Golf Management, Inc. ("KGM"), has
moved for confirmation of the Arbitrator's Decision ("Arbitration
Award") issued by Arbitrator Louis Chang (the "Arbitrator") on
September 28, 2005, in the arbitration between KGM and Respondent
International Longshore and Warehouse Union, Local 142 ("the
Union").  The Union has filed a counter-petition to vacate the
Arbitration Award.  The court grants KGM's petition to confirm
the Arbitration Award and denies the Union's counter-petition to
vacate the Arbitration Award.

II.      BACKGROUND

       Neither party contests the Arbitrator's background
facts in this case, and this court adopts those facts.  The facts
are set forth below to provide the context of this order.

Mario Marinas was hired as a groundskeeper for a golf course located in Kaanapali, Maui, in November 1989. Thereafter, Marinas was employed by a number of different employers that owned and/or managed the golf course. For example, Marinas was employed by Amfac Property Investment Corp. ("Amfac") until approximately March 2002. From September 1999, Marinas was covered by a Collective Bargaining Agreement between Amfac and the Union ("Amfac CBA").

In March 2002, a lender began foreclosure proceedings in state court relating to the golf course, and a receiver was appointed by that court. The receiver operated the golf course from March 2002 through August 2003. Apparently, the Amfac CBA was terminated in March 2002. There was no CBA in effect from March 2002 through August 2003. It appears that Marinas was still employed as a groundskeeper for the golf course during this period.

About September 2003, the Employee Retirement System for the State of Hawaii ("ERS") purchased the golf course in a foreclosure sale. ERS then hired KGM to manage the golf course, and KGM hired Marinas as a groundskeeper. In a letter dated August 12, 2003, KGM told Marinas that he was being hired as a groundskeeper and that he would be eligible for the benefits outlined in KGM's employee handbook. Marinas accepted and agreed to the terms of the August 12, 2003, letter by signing it that

same day.  See Ex. 3.  A copy of the employee handbook is
included in the record as Exhibit 2 ("Employee Handbook").

Marinas began working for KGM on September 10, 2003.
At that time, KGM was not a union employer.  On September 24,
2003, KGM recognized the Union as the collective bargaining
representative for the golf course employees.  KGM and the Union
then entered into collective bargaining negotiations.

In January 2004, before KGM and the Union had
negotiated a new CBA, Marinas was injured at work.  After that,
Marinas worked only 1½ hours.  There is no dispute that, under
the terms of the Employee Handbook, KGM was only obligated to
provide medical insurance coverage for Marinas through April
2004.  See Counter Petition (Dec. 9, 2005) at 4 ("ILWU Local 142
does not dispute the fact that the Employer had the right to
terminate the medical coverage in May 2004 according to the
Employee Handbook.").  KGM provided medical insurance benefits to
Marinas by paying 80% of the premiums.

Through an oversight, KGM provided coverage through
July 2004.  In a July 4, 2004, letter, KGM notified Marinas that
he would no longer receive medical insurance coverage paid for by
KGM after the end of July 2004.  In other words, unless Marinas
exercised his option to continue his medical insurance coverage
under the provisions of COBRA, he would cease to have medical
insurance coverage through KGM's plan as of August 1, 2004.

Marinas paid his own medical insurance premiums for August 2004
through October 2004, but stopped paying those premiums after
that because he was unable to afford them.

KGM and the Union entered into a CBA that was effective
from August 1, 2004, though July 31, 2007 ("KGM CBA").  See
Ex. 1.  Although the Union recognized that KGM properly
terminated Marinas's medical insurance under the terms of the
Employee Handbook, the Union argued that, once the KGM CBA took
effect on August 1, 2004, KGM had a renewed responsibility to pay
for Marinas's insurance benefits.  The Union contended that
section 12.01 of the KGM CBA, in conjunction with section 3.01 of
the KGM CBA, indicated that Marinas was an "eligible" employee
and was therefore entitled to medical insurance coverage.  KGM,
on the other hand, argued that the language of section 12.01 was
clear and unambiguous, indicating that it was not required to pay
the premiums for Marinas's medical insurance.

In relevant part, section 3.01 of the KGM CBA states
that the "employees covered by this agreement are all regular
full-time and regular part-time employees of . . . [KGM] employed
at the Kaanapali Golf Courses as . . . groundskeepers."  Section
12.01 of the KGM CBA requires KGM to "offer all eligible
employees covered by th[e] agreement Kaiser Plan A with drug and
vision rider."  Alternatively, section 12.02 of the KGM CBA
allows employees to "elect coverage under Kaiser Plan B of HMSA

4

Plan PPP, HPH and Comp Med, with drug and vision rider[s]."
Section 12.03 of the KGM CBA states, "Medical benefits for new
employees will commence on the first day of the month following
sixty (60) days of employment."

Section 23 of the KGM CBA sets forth the grievance and
arbitration procedure.  Section 24.05 of that CBA indicates that
decisions of arbitrators are "final and binding upon the
parties."  However, that same section indicates that such
"decisions . . . shall be limited expressly to the terms and
provisions of this agreement and in no event may the terms and
provisions of this agreement be altered, amended, or modified by
the arbitrator."  Section 26.01 of the KGM CBA say that the KGM
CBA "contains the entire agreement of the parties and neither
party has made any representations to the other which are not
contained herein."  Finally, section 27.01 of that CBA indicates
that the KGM CBA "shall not be amended, modified, changed,
altered, or waived except by written document executed by the
parties hereto."

The Union grieved KGM's refusal to pay for Marinas's
medical insurance after July 2004.  The Union and KGM arbitrated
the issue.  The Arbitrator phrased the scope of the issues before
him as "1. Whether the Employer [KGM] violated the Collective
Bargaining Agreement by not contributing to the Health Care Plan

after August 1, 2004?" and "2. If so, what is the appropriate remedy."

The Arbitrator's discussion started by recognizing that the KGM CBA contained language indicating that he was not to add to, subtract from, or modify that CBA.  The Arbitrator noted that the language of the KGM CBA "restricts the arbitrator to interpreting the existing contract language."  Arbitration Award at 8.  The Arbitrator recognized that, under these circumstances, he was to apply the plain meaning of the CBA's terms if the language was clear and unambiguous.  If, however, the contract language was ambiguous, he noted that he could turn to the rules of contract construction and then to parol evidence to determine the CBA's meaning.  The Arbitrator noted that the two most common types of parol evidence considered by arbitrators are the parties' bargaining history and their past practice.  Id. at 8-9.

Both KGM and the Union argued to the Arbitrator that the language of the KGM CBA was clear and unambiguous.  KGM argued that section 12.01 contained no indication or evidence of any intent to have KGM pay an employee's medical insurance premiums when that employee was already on an extended leave because of a disability.  The Union, on the other hand, argued that Marinas was an "eligible" employee because he had worked for KGM for more than sixty days, and, under section 12.03 of the CBA, "Medical benefits for new employees will commence on the

first day of the month following sixty (60) days of employment."
Of course, at the time the CBA became effective in August 2004,
Marinas had worked for KGM for close to a year.

The Arbitrator determined that sections 12.01 through
12.03 did not expressly address whether KGM had an "obligation to
provide medical insurance coverage in the specific context of an
employee on long[-]term leave of absence due to disability."
Arbitration Award at 9.  He concluded that the contractual
provisions regarding provision of medical insurance to Marinas
were not clear and unambiguous.  Id.  He therefore looked to the
parties' bargaining history and past practice to determine
whether the parties had intended to provide that insurance to
Marinas.  Id.

The Arbitrator determined that the parties' bargaining
history indicated that they did not intend for Marinas to
continue to receive medical insurance paid for by KGM.  See
Arbitration Award at 14.  The Union had proposed language for the
CBA that addressed the continuation of medical insurance in the
context of leaves of absence for serious health conditions.  See
id. at 10.  Because that language was not included in the CBA,
the Arbitrator reasoned that its omission indicated an intent not
to be bound by the language.  Id. at 14.

The Union now argues that KGM had also proposed
language limiting medical insurance coverage that was not

7

included in the KGM CBA.  According to the Union, the
Arbitrator's own reasoning requires the conclusion that the
omission of that language from the KGM CBA similarly indicates an
intent not to be bound by that language.  Although each party
rejected the other's proposed language, and although the parties
lacked a "past practice" given their new relationship, the
Arbitrator noted that both parties had agreed to maintain their
"current practice" with respect to payment of medical insurance
premiums.  Id. at 11-12.  The parties, however, had not
explicitly defined what "current practice" was.  KGM argued that
"current practice" meant maintaining its obligations under the
Employee Handbook.  The Union, however, argued that maintaining
the "current practice" meant continuing the obligations in effect
under the Amfac CBA, which predated the Employee Handbook and
KGM's involvement with the golf course.  The Arbitrator rejected
the Union's argument, stating that the plain meaning of "current
practice" was the practice existing when the KGM CBA took effect.
Accordingly, the Arbitrator concluded that the then-existing
"current practice" was set forth in KGM's Employee Handbook.
Id. at 13.

        The Arbitrator then determined by a preponderance of
the evidence that, with respect to Marinas's medical insurance
coverage, the parties had intended to continue that coverage
under the terms of the Employee Handbook.  Id. at 16.  In other

words, the Arbitrator held that the CBA did not require KGM to continue to pay for Marinas's medical insurance.  The Arbitrator therefore ruled in favor of KGM and against the Union.

III.      LEGAL STANDARD.

          The court's review of arbitration awards is extremely limited, and courts give such awards great deference.  See Stead Motors of Walnut Creek v. Auto. Machinists Lodge No. 1173, 886 F.2d 1200, 1205 (9th Cir. 1989) (en banc) (stating that federal courts give a "nearly unparalleled degree of deference" to arbitrators' decisions); Haw. Teamsters & Allied Workers Union, Local 996 v. United Parcel Serv., 241 F.3d 1177, 1180 (9th Cir. 2001) ("Our review of labor arbitration awards is, however, extremely deferential because courts do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts." (internal citations and quotations omitted)).  An arbitration award is entitled to great deference

> [b]ecause the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, [and] it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept.  Courts thus do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts.

United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc., 484 U.S. 29, 37-38 (1987).

9

The Ninth Circuit has described this court's review of arbitration awards pursuant to a CBA as follows:

> Section 301 of the Labor Management Relations Act authorizes the district courts to enforce or vacate an arbitration award entered pursuant to a collective bargaining agreement. However, judicial review of an arbitration award is both limited and highly deferential. Thus, the court may not review the merits, but must ask only whether the grievance is governed by the contract and whether the parties agreed to arbitrate the dispute. As long as the award "draws its essence" from the contract, meaning that on its face it is a plausible interpretation of the contract, then the courts must enforce it. The arbitrator's interpretation of the scope of issues submitted to him is entitled to the same deference.

Sheet Metal Workers' Int'l Ass'n Local Union No. 359 v. Madison Indus., Inc. of Ariz., 84 F.3d 1186, 1190 (9th Cir. 1996) (internal citations omitted); see also Major League Baseball Players Ass'n v. Garvey, 532 U.S. 504, 509 (2001) (per curiam) ("Courts are not authorized to review the arbitrator's decision on the merits despite allegations that the decision rests on factual errors or misinterprets the parties' agreement. We recently reiterated that if an arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, the fact that a court is convinced he committed serious error does not suffice to overturn his decision. It is only when the arbitrator strays from interpretation and application of the agreement and effectively dispenses his own

10

brand of industrial justice that his decision may be unenforceable." (internal quotations and citations omitted)).

"As long as the arbitrator's award 'draws its essence' from the collective bargaining agreement, it must be enforced." Sunshine Mining Co. v. United Steelworkers of Am., AFL-CIO, CLC, 823 F.2d 1289, 1293 (9th Cir. 1987).  In other words, this court's "task is to determine *whether* the arbitrator interpreted the collective bargaining agreement, *not* whether he did so correctly."  Haw. Teamsters, 241 F.3d at 1178.

The Ninth Circuit has recognized only three narrow exceptions to the general rule of deferring to an arbitrator's decision: 1) when the arbitrator's award does not draw its essence from the CBA; 2) when the arbitrator exceeds the boundaries of the issues submitted to him; and 3) when the award is contrary to public policy.  United Food & Commercial Workers Int'l Union, Local 588 v. Foster Poultry Farms, 74 F.3d 169, 173 (9th Cir. 1995).

IV.     ANALYSIS.

Under the Labor Management Relations Act, an arbitration award "draws its essence" from the contract "if it is based on the contractual language and the parties' conduct." Sunshine Mining, 823 F.2d at 1293.  It fails to "draw its essence" from the contract in "those egregious cases in which a court determines that the arbitrator's award ignored the plain language of the contract, [meaning] that he 'manifestly

11

disregarded' the contours of the bargain expressed in outline by the collective bargaining agreement." <u>Stead Motors</u>, 886 F.2d at 1205 n.6.

The Arbitration Award drew its essence from the CBA, as the Arbitrator determined that the CBA did not require KGM to pay the medical insurance premiums for Marinas.  The Arbitrator first examined the express language of the CBA, finding that it did not specifically address the issue.  In other words, the Arbitrator first determined that the language of the CBA did not expressly require KGM to continue to pay Marinas's medical insurance premiums.

The Arbitrator then looked to outside evidence to help him determine whether the parties had intended for the KGM CBA to provide medical insurance coverage for Marinas without explicitly stating so.  The Arbitrator determined that the KGM CBA was sufficiently ambiguous to justify his receipt of and reliance on evidence to help him determine whether KGM and the Union had intended for Marinas to receive medical insurance after August 2004 at KGM's expense.  Based on the failure of the Union to have the language it proposed included in the CBA, and based on the parties' agreement that they intended to continue their "current practice," which the Arbitrator determined was set forth in the Employee Handbook, the Arbitrator ruled in KGM's favor, holding that the CBA did not require KGM to continue to pay Marinas's

medical insurance premiums.  Because the Arbitrator at least
arguably based his decision on the language of the CBA and the
parties' conduct and interpreted and applied the CBA, this court
confirms the Arbitration Award.  See Haw. Teamsters, 241 F.3d at
1178 (if the arbitrator even arguably construed or applied the
CBA, the court must affirm the arbitration award).  It is not
this court's task to determine whether the Arbitrator correctly
decided the issue before him.  Id.

        The court is unconvinced by the Union's argument that
the Arbitrator exceeded his power.  The Union argues that the
Arbitrator violated the CBA's prohibitions against the
alteration, amendment, or modification of the CBA.  This
argument, however, assumes that the CBA provided for medical
insurance coverage for Marinas in the first place.  In holding
that the CBA did not require KGM to pay the medical insurance
premiums for Marinas, the Arbitrator did not alter, amend, or
modify the CBA, as there was no express provision in the CBA that
required KGM to pay those premiums.  The Union relies on section
12.03 of the CBA, which applies to "new employees."  Section
12.03, however, does not indicate that Marinas was an "eligible"
employee for whom KGM was required to provide medical insurance.
The Union argues that Marinas was an "eligible" employee merely

13

because he had worked more than sixty days,[1] but section 3.01 of the KGM CBA provides that an "eligible" employee is a "regular full-time" or "regular part-time employee."  The Arbitrator's decision implicitly held that Marinas was neither, and this court may not review such a holding.  See Garvey, 532 U.S. at 509; Sheet Metal, 84 F.3d at 1190.

The Union next argues that, because the language of section 12.03 is plain and unambiguous, the Arbitrator wrongly considered other evidence outside the CBA to determine the issue presented to him.  But the plain language of section 12.03 does not say that an employee in Marinas's position is "eligible" for medical insurance benefits.  The Arbitrator looked to evidence outside the CBA to determine whether the parties intended for the KGM CBA to require KGM to pay for Marinas's medical insurance benefits, even if they failed to clearly state that in the CBA. Whether Marinas could be considered a "regular full-time" or "regular part-time employee" eligible for benefits under section 3.01 of the KGM CBA was sufficiently ambiguous to allow the Arbitrator to look to outside evidence to interpret the meaning of that section.

---

[1]Section 12.03 states: "Medical benefits for new employees will commence on the first day of the month following sixty (60) days of employment."  The "plain language" of section 12.03 does not address whether Marinas, having worked more than sixty days for KGM, was a "new employee" eligible for medical benefits under the KGM CBA.

Even if the Arbitrator improperly considered other evidence of the agreement between the parties, however, Marinas would not necessarily prevail.  The Arbitrator had already determined that the CBA did not expressly require KGM to pay the medical insurance premiums for Marinas.  Given that determination, the Arbitrator could not have decided anything at all absent review of outside evidence.[2]  The Arbitrator determined what the parties had agreed to, given the CBA's failure to expressly address the matter.

The cases from other jurisdictions cited by the Union do not support vacating the Arbitration Award.  For example, in the Anheuser-Busch case cited by the Union, the Seventh Circuit vacated an arbitration award, but only after finding that the arbitrator had ignored the clear and unambiguous language of the CBA.  See Anheuser-Busch, Inc. v. Beer, Soft Drink, Water, Fruit Juice, Carbonic Gas, Liquor Sales Drivers, Helpers, Inside Workers, Bottlers, Warehousemen, Sch., Sightseeing, Charter Bus Drivers, Gen. Promotions Employees, & Employees of Affiliated Indus., Maltster, Laborers, Syrup, Yeast, Food, Vinegar, Brewery, Recycling & Misc. Workers of Chicago & Vicinity, Il., Local Union No. 744, Affiliated with the Int'l Bhd. of Teamsters, 280 F.3d

---

[2]The Union appears to have refrained from objecting to the Arbitrator's consideration of the evidence at the time it was presented.  In fact, it appears that the Union actively participated in presenting such evidence to the Arbitrator.

1133, 1139 (7th Cir. 2002) ("*[N]either the arbitrator nor the parties contend that there is any ambiguity* in the language of the contract establishing commission rates for drivers.  Thus, there was no need for the arbitrator, in reaching his desired result, to 'interpret' the unambiguous contract by reaching outside the contractual language and creating a scheme to rely on past contradictory practices or customs.").  Unlike <u>Anheuser-Busch</u>, in which the arbitrator intentionally disregarded the clear and specific language of the CBA, thus dispensing his "own brand of industrial justice," the Arbitrator here did not disregard the KGM CBA.

     <u>Northwest Airlines, Inc. v. Int'l Ass'n of Machinists & Aerospace Workers, Air Transport Dist. Lodge No. 143</u>, 894 F.2d 998 (8th Cir. 1990), cited by the Union, is similarly distinguishable.  In that case, the union and the employer had entered into an agreement that stated that an employee would be reinstated if he obtained a valid driver's license (a requirement for the employee's job) by November 1, 1986.  The agreement provided that, if the employee did not obtain a driver's license by that date, he would be deemed to have voluntarily resigned.  <u>Id.</u> at 998-99.  After the employer refused a requested extension of time to obtain the license, the union filed a grievance.  An arbitration board then reinstated the employee.  <u>Id.</u>  The district court vacated the arbitration award, and the Eighth Circuit affirmed, noting that,

although an arbitrator "may interpret ambiguous language, the arbitrator may not disregard or modify unambiguous contract provisions." <u>Id.</u> at 1000.  The Eighth Circuit held that, because the arbitration board disregarded the plain language of the agreement, it acted without authority.  The Eighth Circuit therefore affirmed the district court's decision to vacate the award.  <u>Id.</u>  Nothing before this court suggests that the Arbitrator disregarded the plain language of the KGM CBA, rather than interpreting provisions that were not entirely clear.

V.        <u>CONCLUSION.</u>

          For the foregoing reasons, the court grants KGM's petition to confirm the Arbitration Award and denies the Union's petition to vacate the Arbitration Award.  The Clerk of Court is directed to enter judgment in favor of KGM and to close this case.

                   IT IS SO ORDERED.

                   DATED:  Honolulu, Hawaii, January 12, 2006



                                   _____
                                   Susan Oki Mollway
                                   United States District Judge

<u>Kaanapali Golf Management, Inc., v. International Longshore & Warehouse Union, Local 142</u>, Civ. No.  05-00672 SOM/KSC; ORDER CONFIRMING ARBITRATION AWARD